**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLASSHOUSE SYSTEMS, INC., | : | |
|     Plaintiff. | : | |
| | : | CIVIL ACTION |
|         v. | : | |
| | : | NO. 08-2831 |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION, | : | |
|     Defendant. | : | |

**MEMORANDUM AND ORDER**

**March _16_, 2009**                                                                                   **Anita B. Brody, J.**

**I. INTRODUCTION**

This case arises from a dispute between the computer company International Business Machines Corporation ("IBM") and a company authorized to sell IBM's products. GlassHouse Systems, Inc., ("GlassHouse") complains that IBM promised to give it exclusive favorable pricing, induced it to expend resources cultivating a major client, and then scuttled GlassHouse's imminent deal with that client by giving favorable pricing to another seller. The Complaint asserts claims of promissory estoppel, breach of fiduciary duty, negligent misrepresentation, equitable estoppel, intentional interference with business advantage, and unjust enrichment. New

York law applies to the adjudication of these claims.[1]  Subject matter jurisdiction is exercised under 28 U.S.C. § 1332.[2]

IBM has moved to dismiss the Complaint under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim upon which relief can be granted (Doc. #4).  I will grant this motion in part.  The claims of breach of fiduciary duty, negligent misrepresentation, and unjust enrichment (counts II, III, and VI) should be dismissed because they are precluded by a contract between IBM and GlassHouse.  The claim of intentional interference with business advantage (count V) should be dismissed because the Complaint makes insufficient factual allegations.  But the claims of promissory estoppel and equitable estoppel (counts I and III) should not be dismissed because IBM's promise of exclusive favorable pricing may have been extraneous to the contract.

## II. B<sub>ACKGROUND</sub>[3]

IBM is a major technology company that makes and sells computer products and offers related services.  Over ten years ago, GlassHouse and IBM entered into a contract ("Agreement") whereby GlassHouse became an IBM Business Partner ("BP") authorized to sell IBM products

---

[1] Based on a choice-of-law provision in a contract between IBM and GlassHouse, both sides agree that New York law should govern the dispute.  (Def.'s Br. 1; Pl.'s Resp. 3 n.1.)

[2] Complete diversity exists because IBM was incorporated in New York and has its principal place of business in New York, whereas GlassHouse was incorporated in Vermont and has its principal place of business in Illinois.  The amount in controversy far exceeds $75,000.

[3] In deciding a 12(b)(6) motion, a court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).  Thus, the facts are stated in the light most favorable to GlassHouse.

and services as an independent contractor.[4]  (See Pl.'s Resp. Ex. A [hereinafter "Agr'm."].)  IBM has nearly identical contracts with other BPs.

The Agreement describes IBM's relationship with GlassHouse and explains how IBM determines and communicates the terms and prices at which BPs may market and sell IBM products and services.  (Agr'm. 10, 19, 25; Compl. ¶ 15.)  Here are some material provisions:

- "Business Partner is a business entity which is approved by us to market Products and Services under this Agreement."  (Agr'm. 8.)

- "[B]oth of us are independent contractors, and this Agreement is non-exclusive. … [E]ach of us is responsible for our own expenses regarding fulfillment of our responsibilities and obligations under the terms of this Agreement."  (Agr'm. 10.)

- "As our IBM Business Partner … we approve you to market on our behalf at prices and terms established by IBM. … You agree to … actively market Products and Services."  (Agr'm. 19.)

- "The price, charge and discount if we specify one, for each Product and Service will be made available to you in a communication which we provide to you in published form or through our electronic information systems or a combination of both."  (Agr'm. 25.)

- "You earn your fee on the date of our invoice to the End User. … You are only entitled to compensation for orders IBM accepts during the contract duration."  (Agr'm. 20.)

Although each BP must "actively market Products and Services," the Agreement also provides that IBM may offer special incentives such as letting a BP offer special pricing to

---

[4] Relevant portions of the Agreement were filed along with GlassHouse's responsive pleading. Both sides agree that I may consider them under Rule 12(b)(6).  (Def.'s Br. 2 n.1; Pl.'s Resp. 4 n.2.)  See Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004) ("[A]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotations omitted).

customers.  (Agr'm. 12, 19; Compl. ¶ 15.)  The Agreement states: "We may provide marketing funds and promotional offerings to you.  If we do, you agree to use them according to our guidelines."  (Agr'm. 12.)

Several times before 2005 in publications and at conferences, IBM communicated to GlassHouse and others that when a BP has performed a certain amount of selling and marketing to develop an account with a customer, that BP will receive more favorable pricing for that customer than other BPs who have not performed such activities.  Crucially, the Complaint does not specify whether this promise was made pursuant to the Agreement.

From 2002 to 2006, GlassHouse cultivated an account with SEI Investments, Inc., ("SEI") a company that provides financial services to individuals and businesses.  Initially, SEI used non-IBM central processing units ("CPUs").[5]  SEI became an IBM mainframe customer in 2006 when GlassHouse sold it new CPUs and mainframe technology made by IBM.

In October 2006, GlassHouse had several meetings with SEI about "migrating" to more advanced technology.  On October 19, 2006, IBM approved GlassHouse's request to offer SEI special pricing for the migration.  In December 2006, SEI agreed to buy the new technology.  On December 14, 2006, IBM approved GlassHouse's second request for special pricing.  These approvals indicated to GlassHouse that no other BP had cultivated an account with SEI.

After SEI canceled the planned migration to conduct more studies, GlassHouse continued selling and marketing to SEI from January 2007 into the summer.  GlassHouse also discussed with IBM the proposed migration, and IBM stressed how important the SEI account was.  In July

---

[5] Also called "processors," CPUs are computer hardware that execute operations dictated by computer software.

and August 2007, IBM approved multiple requests by GlassHouse to offer special pricing to SEI. GlassHouse then submitted a bid to SEI for the migration. SEI responded with a concern about pricing.

In August 2007, GlassHouse learned that another BP Mainline Information Systems, Inc., ("Mainline") planned to compete for the SEI account. GlassHouse emailed Mainline to ask whether it planned to seek special pricing from IBM, but Mainline never responded. On August 14, 2007, GlassHouse asked IBM whether Mainline would receive special pricing. IBM responded: "Mainline has responded that they don't qualify for [special pricing] at SEI." (Compl. ¶ 35.) GlassHouse was thus the only BP qualified to offer special pricing to SEI.

On September 13, 2007, IBM gave Mainline permission to offer special pricing to SEI. This allowed Mainline to free-ride on GlassHouse's prolonged efforts to cultivate SEI. Mainline then submitted a bid lower than GlassHouse's bid. GlassHouse submitted another competing bid, but ultimately SEI went with Mainline.

**III. STANDARD**

According to Rules 8(a) and 12(b)(6), a complaint must "mak[e] a sufficient showing of enough factual matter (taken as true) to suggest the required elements" for each claim asserted. Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008). The allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery

will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 234 (3d Cir. 2008) (quoting Twombly, 127 S.Ct. at 1965). When deciding a 12(b)(6) motion a court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips, 515 F.3d at 233 (internal quotations omitted).

**IV. DISCUSSION**

The Complaint asserts claims of promissory estoppel (count I), breach of fiduciary duty (count II), negligent misrepresentation (count III), equitable estoppel (count IV), intentional interference with business advantage (count V), and unjust enrichment (count VI). Notably, GlassHouse does not assert a claim for breach of contract. Only tort or quasi-contract claims are asserted. IBM argues that all six claims must be dismissed because in New York only a breach-of-contract claim may be asserted where a dispute occurs within a contractual relationship. (Def.'s Br. 5-10.)

Contract, quasi-contract, and tort claims all assert breaches of duty, but they involve different policies and sources of duty. Private agreement creates the duty involved in a contract claim, whereas statute or case law creates the duty involved in a quasi-contract or tort claim. See Bradkin v. Leverton, 257 N.E.2d 643, 645 n.2 (N.Y. 1970) (noting that quasi-contract and tort duties are imposed by law regardless of consent). Moreover, contract and quasi-contract duties both concern a relationship of mutual exchange, whereas tort duties concern other policies. See id. at 645 ("Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort."); 66 Am. Jur. 2d Restitution and Implied

Contracts § 2 (2008) ("Contracts implied in law [i.e., quasi-contracts] are fictions of law adapted to enforce legal duties by actions of contract.").

Because of these differences, New York courts have developed two doctrines that preclude a plaintiff from asserting a quasi-contract or tort claim based on events that occurred within a contractual relationship. New York's highest court explained both doctrines in Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193-94 (N.Y. 1987).

First, a person cannot sue in quasi-contract for a dispute that occurred within a contractual relationship. Id. at 193. Specifically, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Id. "It is impermissible … to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." Id. See also Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 587-88 (N.Y. 2005) (holding that buyers of life insurance who sued because their contract required payment before coverage began could not assert a quasi-contract claim because "the disputed terms and conditions fall entirely within the insurance contract").

Second, a person cannot sue in tort for a breach of contract. Clark-Fitzpatrick, 516 N.E.2d at 193. "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Id. "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Id. at 194. The court later explained:

> A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care.

Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551-52 (N.Y. 1992). "In disentangling tort and contract claims," courts also consider "the nature of the injury, the manner in which the injury occurred and the resulting harm." Id. at 552. In short, "[w]here a plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory."[6] Id.

Together, these doctrines provide that a plaintiff cannot support quasi-contract or tort claims with circumstances that are covered by a contract. Only a dispute not arising from a contract's subject matter or clearly covered by a contract's scope can support a quasi-contract claim, and only "circumstances extraneous to, and not constituting elements of, [a] contract" can support a tort claim. Clark-Fitzpatrick, 516 N.E.2d at 193-94. For this reason, I cannot consider allegations of circumstances that are covered by the Agreement in evaluating the Complaint under Rule 12(b)(6). With this in mind, I consider each claim below.

A.  Promissory Estoppel and Equitable Estoppel (Counts I and IV)

IBM does not dispute the sufficiency of GlassHouse's allegations for the promissory-estoppel and equitable-estoppel claims but simply argues that these claims must be dismissed under Clark-Fitzpatrick. (Def.'s Br. 10-12, 16-17; Def.'s Reply 9, 15.) Both claims turn on

---

[6] Notably, a contractual relationship may preclude a tort claim even when a court finds the alleged contract invalid, see, e.g., Papa v. N.Y. Tel. Co., 72 N.Y.2d 879, 881 (N.Y. 1988), or when a plaintiff does not assert a breach-of-contract claim, see, e.g., Internationale Nederlanden Capital Corp. v. Bankers Trust Co., 689 N.Y.S.2d 455, 459 (N.Y. App. Div. 1999).

IBM's promise to give GlassHouse exclusive favorable pricing.[7]  IBM maintains that these claims must be dismissed under Clark-Fitzpatrick because the promise was made pursuant to the Agreement.[8]  Because these are tort claims, I must determine whether IBM's promise was "extraneous to, and not constituting [an] element[] of," the Agreement.  Clark-Fitzpatrick, 516 N.E.2d at 194.

Unfortunately, the Complaint makes this question hard to answer.  One allegation may suggest that IBM's promise was made outside the Agreement.  The Complaint states that "IBM representatives expressly communicated" the promise "in various IBM trade publications, and at conferences with IBM."  (Compl. ¶ 21.)  But other allegations may suggest the opposite.  Describing the promise, the Complaint states that "IBM provides its BP's [sic] with written rules, policies and protocols setting forth the conditions on which a BP will be awarded special pricing."  (Compl. ¶ 19.)  Then it explains: "These rules, policies and protocols constitute representations or promises from IBM as to how it will conduct its relationships with its BP's [sic]."  (Compl. ¶ 20.)

The Agreement does not provide any better guidance.  It never mentions the promise explicitly but does contain relevant language.  It provides: "We may provide marketing funds and

---

[7] Promissory estoppel requires "a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise."  Williams v. Eason, 854 N.Y.S.2d 477, 479 (N.Y. App. Div. 2008).  Equitable estoppel was designed to "prevent the infliction of unconscionable injury and loss upon one who has relied on the promise of another."  Am. Bartenders Sch., Inc. v. 105 Madison Co., 59 N.Y.2d 716, 718 (N.Y. 1983).

[8] IBM does not argue that the Agreement covers the circumstances alleged to show reliance, namely, GlassHouse's marketing and selling to SEI.  Thus, I have not considered this.

9

promotional offerings to you.  If we do, you agree to use them according to our guidelines." (Agr'm. 12.)  The Agreement also provides: "The price, charge and discount if we specify one, for each Product and Service will be made available to you in a communication."  (Agr'm. 25.)

Given such uncertainty, the precise requirements of Rules 8 and 12(b)(6) are critical.  On one hand, a complaint must "mak[e] a sufficient showing of enough factual matter (taken as true) to suggest the required elements."  Phillips, 515 F.3d at 235.  It cannot merely leave "open the possibility that a plaintiff might later establish some set of [undisclosed] facts to support recovery."  Id. at 233 (quoting Twombly, 127 S.Ct. at 1968 (alteration in original)).  On the other hand, a court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips, 515 F.3d at 233 (internal quotations omitted).

Once given the most favorable construction that reason allows, the Complaint may be read to allege that IBM's promise of exclusive favorable pricing was made outside the Agreement.  I find most dispositive that the Agreement does not mention such a promise and that the Complaint alleges the promise to have been made "in various IBM trade publications, and at conferences with IBM."  (Compl. ¶ 21.)  Therefore, counts I and IV should not be dismissed.

B.  Breach of Fiduciary Duty and Negligent Misrepresentation (Counts II and III)

GlassHouse's claims for breach of fiduciary duty and negligent misrepresentation both require a special relationship between GlassHouse and IBM.[9]  IBM argues that they must be

---

[9] Breach of fiduciary duty requires a "fiduciary relationship," which "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon

dismissed under Clark-Fitzpatrick because the alleged circumstances offered to show this relationship are covered by the Agreement. (Def.'s Br. 12-16; Def.'s Reply 9, 14.) Once again, I must determine whether these circumstances were "extraneous to, and not constituting elements of," the Agreement. Clark-Fitzpatrick, 516 N.E.2d at 194.

To show the requisite special relationship, the Complaint alleges that IBM determined "the pricing structure" that a BP can offer to customers, which BP will receive special pricing, and which BP will service a particular account. (Compl. ¶ 15.) These circumstances clearly arise from the Agreement, which states the following:

- "As our IBM Business Partner … we approve you to market on our behalf at prices and terms established by IBM." (Agr'm. 19.)

- "The price, charge and discount if we specify one, for each Product and Service will be made available to you in a communication." (Agr'm. 25.)

- "You are only entitled to compensation for orders IBM accepts during the contract duration." (Agr'm. 20.)

Because it was the Agreement that created the requisite special relationship alleged in the Complaint, GlassHouse's claims for breach of fiduciary duty and negligent misrepresentation cannot proceed. See Clark-Fitzpatrick, 516 N.E.2d at 193 ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."). Therefore, counts II and III must be dismissed.

---

matters within the scope of the relation," and which "is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19 (N.Y. 2005). Negligent misrepresentation requires a "special relationship" that "is akin to a fiduciary duty, but need not rise to that same level." Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F.Supp.2d 118, 153 (S.D.N.Y. 2000).

C.  Intentional Interference with Business Advantage (Count V)

New York law recognizes a cause of action for "interfering with a nonbinding 'economic relation.'"[10] Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189 (N.Y. 2004).  This requires a plaintiff to prove "that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (stating New York law).  Regarding the third element, "the defendant's conduct must amount to a crime or an independent tort" and must be "directed not at the plaintiff … but at the party with which the plaintiff has or seeks to have a relationship." Carvel, 3 N.Y.3d at 190, 192.

GlassHouse has not alleged facts that satisfy the third element.  IBM's only conduct possibly directed at SEI was allowing Mainline to offer special pricing.  In other words, IBM might have persuaded SEI to buy from Mainline by allowing this special pricing.  But this cannot be considered a crime or independent tort.  Reaching the same conclusion, Carvel held that a distributor that sold its product through franchised stores did not unlawfully interfere with the franchisees' business relations with potential customers when it began also selling its product through supermarkets.  Id. at 2-7.  The court explained: "all Carvel did to the franchisees' customers was to make Carvel goods available in supermarkets at attractive prices; this … was

---

[10] "Courts refer to this cause of action by a number of different names, including prospective economic advantage, beneficial business relations, prospective business advantage, and business or economic relations." Henneberry v. Sumitomo Corp. of Am., 532 F.Supp.2d 523, 547 n.12 (S.D.N.Y. 2007).

not 'pressure' on these third parties but legitimate 'persuasion,' and thus tortious interference with economic relations was not established." Id. at 5. Because GlassHouse's allegations are insufficient, count V must be dismissed.

D.  Unjust Enrichment (Count VI)

A valid contractual relationship covering a particular subject matter precludes an unjust-enrichment claim for events arising out of that subject matter. Clark-Fitzpatrick, 516 N.E.2d at 193. Regarding this claim, the Complaint alleges that IBM benefited from GlassHouse's services because from 2002 to 2006 GlassHouse conducted marketing and selling activity toward SEI and encouraged it migrate to new IBM technology. (Compl. ¶¶ 74-75.) These events are plainly covered by the Agreement, which dictates when and how GlassHouse should market and sell to customers such as SEI. It also provides: "[E]ach of us is responsible for our own expenses regarding fulfillment of our responsibilities and obligations under the terms of this Agreement." (Agr'm. 10.) Finally, no one disputes the Agreement's existence and validity. Therefore, count VI must be dismissed.

V.  CONCLUSION

Counts II, III, and VI must be dismissed because they are precluded by the Agreement. Count V must be dismissed because GlassHouse has not alleged sufficient facts to suggest interference with business relations. Finally, counts I and IV should not be dismissed because they depend on allegations not clearly covered by the Agreement, and IBM has offered no other reason to dismiss them.

**ORDER**

**AND NOW**, this _16th___ day of March, 2009, it is **ORDERED** that Defendant International Business Machines Corporation's Motion to Dismiss the Complaint of Plaintiff GlassHouse Systems, Inc., (Doc. #4) is **GRANTED** as to Counts II, III, V, and VI, and **DENIED** as to Counts I and IV.

                                                              s/Anita B. Brody
                                      _____
                                          ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: