## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLASSHOUSE SYSTEMS, INC., | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-2831 |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION, | : | |
| Defendant | | |

**October_18, 2010**                                                                 **Anita B. Brody, J.**


## MEMORANDUM

This case addresses a dispute between Defendant International Business Machines Corporation ("IBM") and Plaintiff GlassHouse Systems, Inc. ("GlassHouse"), a company authorized to sell IBM products. GlassHouse alleges that IBM broke its promise to give exclusive favorable pricing when IBM gave a competing business favorable pricing for a major sales opportunity that GlassHouse had spent time developing. On March 16, 2009, the Court dismissed four of GlassHouse's six claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. IBM now requests summary judgment with respect to GlassHouse's two remaining claims: promissory and equitable estoppel. I will grant this motion in part; IBM is entitled to judgment as a matter of law on the equitable estoppel claim, but not on the promissory estoppel claim.

## I. Background[1]

IBM is a major technology company that manufactures computer products and offers services related to those products. IBM contracts with thousands of independent businesses (business partners or "BPs") to market IBM services and products to end-user customers ("end-users"). The contract that IBM uses to authorize these BPs to market on its behalf is known as a Business Partner Agreement.

### A. The Parties' Business Partner Agreement

GlassHouse has been an IBM-authorized BP since 1998, and the companies have periodically renewed their Business Partner Agreement ("the Agreement"). The Agreement describes IBM's relationship with a BP and explains the terms under which BPs may market IBM products to end-users. The Agreement does not describe protocols for how BPs should interact with each other. Some material provisions of the Agreement are:

> As our IBM Business Partner . . . we approve you to market on our behalf at prices and terms established by IBM. . . . You agree to . . . actively market Products and Services.
>
> The price, charge and discount if we specify one, for each Product and Service will be made available to you in a communication which we provide to you in published form or through our electronic information systems or a combination of both.

Pl.'s Opp. Mot. Dismiss Ex. A at 19, 25, ECF No. 10.

---

[1] For the purpose of summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## B. The ODP Program for System z BPs

GlassHouse is one of only thirteen BPs ("z-BPs") that markets IBM's System z products and services.[2]  In 2002, IBM created a program of discounted pricing for its z-BPs called Opportunity Development Pricing ("the ODP program"). The ODP program rewards z-BPs that engage in time-intensive efforts and successfully persuade end-users to adopt System z products.

The central component of the ODP program is the discount itself.  The program provides that when a z-BP performs significant, sustained sales and marketing activities to successfully develop an opportunity with an end-user, IBM will give it a reduced wholesale price on System z products.  In August 2007, the ODP discount for z-BPs was generally 21% below list price.

The ODP program includes rules that IBM requires z-BPs to follow and promises about how IBM will treat the z-BPs.  Together, these protocols enable z-BPs to notify IBM of competition amongst the z-BPs so that IBM can regulate the competition when necessary.  IBM communicated the protocols to z-BPs at advisory council meetings, but the protocols were not written terms of the Business Partner Agreements. After the events that gave rise to this lawsuit, IBM distributed a written description of the ODP program protocols.

One ODP program rule is that the thirteen z-BPs must engage in a process called "self-policing" amongst themselves.  If a z-BP suspects that another z-BP might be discussing a sales opportunity with the same end-user, the first z-BP must contact the second z-BP directly to ask whether the second z-BP intends to request an ODP discount from IBM.  If the second z-BP answers that it will seek ODP, and this leads to disagreement as to who qualifies for ODP on the

---

[2] System z products are high-end computer products marketed to businesses that require servers with significant capacity and speed.

opportunity, then the z-BPs must contact IBM to resolve the conflict by conducting a review. In an ODP review, IBM considers both z-BPs' documentation reflecting their marketing activities to determine whether one, both, or neither z-BP qualifies for the ODP discount. If a z-BP is not awarded ODP, it is permitted to continue to negotiate with the end-user using a non-discounted price; however, a losing z-BP is unlikely to try to compete with a z-BP that has been rewarded the substantial 21% discount. The protocols for self-policing and ODP reviews that IBM created for z-BPs allow z-BPs to discover and resolve conflicts before multiple z-BPs spend considerable time and resources to develop the same sales opportunity.

In contrast, in a noncompetitive situation, a z-BP does not seek official confirmation of its ODP discount on an opportunity until it submits a special bid form for the project to IBM. If more than one z-BP requests ODP on their bid forms for an opportunity, IBM conducts a certification review at that time to determine whether one, both, or neither z-BP qualifies for the ODP discount. The certification review is similar in substance to the ODP review, except that it is conducted by different IBM employees.

Once ODP is awarded in a competitive situation, a z-BP that did not qualify for ODP is "locked out" from ODP for a minimum period of time. A z-BP who loses in an ODP or certification review cannot challenge the decision for ninety days, effectively giving the other z-BP a period in which it enjoys exclusive favorable pricing for a given sales opportunity. Zozzaro Dep. 103:18-24, 377:1-379:3, Feb. 25, 2010; Osborn Dep. 137:3-12, March 4, 2010; Pl.'s Opp. Mot. Summ. J. Ex. 28; *see* Zozzaro Dep. 210:8-11; Pl.'s Opp. Mot. Summ. J. Exs. 11, 46. IBM promised that there were two other ways a z-BP would secure exclusive ODP without a formal ODP review decision from IBM. First, if a BP self-policed and the second z-BP answered that it

would not seek ODP for the opportunity, then the second z-BP was locked out from claiming ODP for that opportunity for ninety days. Zozzaro Dep. 103:13-24, 377:1-379:3; *see id.* at 210:8-11; Pl.'s Opp. Mot. Summ. J. Exs. 11, 41. Second, if a z-BP requested an ODP review and the other z-BP declined to participate, the withdrawing z-BP was locked out from claiming ODP for ninety days. Zozzaro Dep. 103:13-24, 377:1-379:3; Osborn Dep. 137:3-12; *see* Zozzaro Dep. 210:8-11; Pl.'s Opp. Mot. Summ. J. Exs. 11, 46.

The principal impetus for creating the ODP program was incidents in which one z-BP spent considerable time developing a sales opportunity with an end-user and, just prior to finalizing the sale, another z-BP who had not performed comparable development activity entered with a lower bid to win the sale and take away the client's account. The ODP program ostensibly benefits IBM and z-BPs – it creates incentives for z-BPs to spend significant unpaid time developing opportunities, and protects z-BPs when they do so.

### C. The SEI Sales Opportunity

GlassHouse engaged in significant marketing activity to sell IBM products and services to a large financial services company, SEI Investments, Inc. ("SEI"). In March 2006, GlassHouse converted SEI to IBM technology. In late 2006, GlassHouse began discussing a significant upgrade with SEI. In early August 2007, GlassHouse submitted a series of special bid forms to IBM for the SEI upgrade.

Also in early August 2007, a GlassHouse employee told GlassHouse Senior Vice President Joseph Zozzaro that he had heard a rumor that competitor z-BP Mainline intended to pursue the SEI opportunity. On August 13, Zozzaro self-policed by e-mailing Mainline System z

Director Santa Kraft. Zozzaro stated GlassHouse's intention to claim ODP pricing for the SEI opportunity and asked whether Mainline intended to provide SEI with ODP pricing.

After more than twenty-four hours passed without a response from Mainline, Zozzaro e-mailed GlassHouse's IBM representative, Steve Shiflett, and requested that IBM conduct an ODP review. Shiflett forwarded the request for an ODP review to IBM System z Business Partner Manager, John Dieker, to initiate a review. Before starting a review, Dieker asked Mainline's IBM representative, Jeff Rogers, to contact Mainline to see if they were assuming ODP on the opportunity. On August 15, 2007, Mainline told IBM that it would not request an ODP discount and that it declined to participate in a review.[3] IBM notified GlassHouse of Mainline's communication and stated that an ODP review was not necessary considering the absence of a z-BP conflict. At that point, GlassHouse assumed that Mainline's lock-out period for the SEI opportunity had begun.

On September 7, 2007, however, Mainline submitted a special bid form to IBM for the SEI opportunity and requested ODP. Because GlassHouse was also claiming ODP for the opportunity, IBM conducted a certification review of both z-BPs' activity. Six days later, IBM awarded both z-BPs the same ODP price. With the ODP discount, Mainline consummated the SEI deal.

GlassHouse asserts that IBM's awarding of ODP to Mainline breached IBM's promises about maintaining an exclusive period of discounted pricing. In particular, IBM's promises

---

[3] Internal e-mails amongst Mainline representatives show that they declined to participate because they did not believe they had done enough marketing with SEI to qualify for ODP.

meant it should not have given an ODP discount to Mainline for a minimum of ninety days beginning in mid-August.

### D. Procedural History

GlassHouse filed suit against IBM asserting claims of promissory estoppel, breach of fiduciary duty, negligent misrepresentation, equitable estoppel, intentional interference with business advantage, and unjust enrichment. The Court has diversity jurisdiction of this action pursuant to 28 U.S.C. § 1332.[4] Upon IBM's motion, this Court dismissed the claims of breach of fiduciary duty, negligent misrepresentation, and unjust enrichment because they were precluded by the Agreement between IBM and GlassHouse. *GlassHouse Sys., Inc. v. IBM Corp.*, 607 F. Supp. 2d 709 (E.D. Pa. 2009). The claim of intentional interference with business advantage was also dismissed because the Complaint made insufficient factual allegations. *Id.* The claims of promissory estoppel and equitable estoppel were not dismissed because they depended on allegations not clearly covered by the Agreement and IBM offered no other reason to dismiss the claims at that time. *Id.*

### II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Kornegay*

---

[4] The amount in controversy far exceeds $75,000 and complete diversity exists. IBM was incorporated in New York and has its principal place of business in New York; GlassHouse was incorporated in Vermont and has its principal place of business in Illinois. Compl. ¶¶ 8, 9; Answer ¶¶ 8, 9.

*v. Cottingham*, 120 F.3d 392, 395 (3d Cir. 1997). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The factual dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

GlassHouse's remaining claims are promissory estoppel and equitable estoppel. Both claims are based on protocols that IBM allegedly promised to follow in its ODP program. GlassHouse claims that IBM made two specific promises in the program relevant to the present case. First, if a z-BP performed significant and sustained sales and marketing activities to successfully develop an end-user's interest in System z technology, IBM would reward the z-BP by giving it the substantial ODP discount. *See* Compl. ¶¶ 44, 60. Second, if the z-BPs followed protocols to self-police and request ODP reviews, a z-BP who confirmed they were the only z-BP to receive ODP on a sales opportunity would have a ninety-day period of ODP exclusivity. *Id.* GlassHouse asserts that it reasonably relied on these promises in performing three years of

significant and sustained sales activities with an end-user, SEI, and it reasonably relied on these promises in notifying competitor z-BP Mainline about the SEI opportunity. *Id.* ¶¶ 34, 45, 62, 63. When IBM awarded ODP to Mainline for the SEI opportunity during the period of time that GlassHouse had been promised exclusive ODP pricing, IBM injured GlassHouse. *See id.* ¶¶ 46, 64. GlassHouse's promissory estoppel claim asks for damages because IBM promised that it would follow these protocols and it did not. *Id.* ¶¶ 44, 47. GlassHouse's equitable estoppel claim requests damages because IBM failed to reveal the fact that it would not follow these protocols. *Id.* ¶ 61.

IBM moves for summary judgment on both claims under Fed. R. Civ. P. 56 and presents three arguments. First, IBM argues that there is insufficient evidence to support the existence of a clear and unambiguous promise necessary to establish a promissory estoppel claim. Second, IBM argues that GlassHouse has not identified facts necessary to prevail on an equitable estoppel claim. Third, IBM argues the parties' Agreement legally precludes GlassHouse from bringing both estoppel claims. I consider each argument in turn.

## A. Promissory Estoppel Claim (Count I)[5]

Traditionally, "promissory estoppel" is used to enforce a promise in the absence of bargained-for consideration. *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994). Promissory estoppel may also be used to provide relief to a party whose contract is

---

[5] The parties agree that New York law governs these claims. Def.'s Mot. Summ. J. 18; Pl. Opp. Mot. Summ. J. 2 n.1. Indeed, given the interests of the various states in having their laws applied and the significance of contacts between the states and the controversies, Pennsylvania's choice-of-law analysis would indicate that New York is the state with the greatest interest in application of its substantive law to this case.

unenforceable under the Statute of Frauds.[6]  *Id.*  In New York, promissory estoppel requires a

clear and unambiguous promise, reasonable and foreseeable reliance by the promisee, and an

injury sustained from the promisee's reliance.  *Williams v. Eason*, 854 N.Y.S.2d 477, 479 (N.Y.

App. Div. 2008); *Ripple's of Clearview, Inc. v. Le Havre Assoc.*, 452 N.Y.S.2d 447, 449 (N.Y.

App. Div. 1982).

IBM argues that there is insufficient evidence to support the first element of

GlassHouse's claim: the existence of a clear and unambiguous promise.  IBM admits that the key

components of its ODP program have existed since 2002.  IBM admits: (1) it told z-BPs it would

award an ODP discount for significant and sustained marketing activities; (2) z-BPs were

required to engage in self-policing with other z-BPs; and (3) it conducted reviews to determine

which z-BPs deserved ODP when self-policing led a z-BP to request an ODP review.  The only

material facts that the parties dispute relate to when a z-BP became entitled to exclusive ODP

pricing because the competing z-BP was "locked out."  IBM argues an ODP lock-out period did

not exist in August 2007 or, in the alternative, the lock-out period was not a clear and

unambiguous promise communicated to GlassHouse.  This factual dispute is critical because it

determines whether IBM promised GlassHouse exclusive ODP pricing on the SEI opportunity

through September 2007.

GlassHouse has submitted evidence to show that the ODP program included a lock-out

period prior to and in August 2007.  GlassHouse Senior Vice President Joseph Zozzaro testified

that the lock-out period was communicated to z-BPs "in advisory council meetings."  Zozzaro

---

[6] When promissory estoppel is used in this way, some courts have also required a plaintiff show
it will suffer "unconscionable injury" to overcome the Statute of Frauds.  *Cyberchron Corp. v.
Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (collecting cases).

Dep. 103:5.  IBM promised it would apply a lock-out period to a competing z-BP when (1) it responds that it will not claim ODP during self-policing or (2) it "elected not to participate in an ODP review."  *Id.* at 103:13-18.  During this period, the other z-BP "could not request ODP for the duration of that opportunity or a minimum of 90 days."  *Id.* at 103:22-24.

Statements by IBM employees support Zozzaro's testimony about the existence of a lock-out.  In a 2007 e-mail to a coworker, IBM representative Clint Osborn wrote: "[I]t is Pre-sales practice that if [a BP] withdraws from an ODP Review or if ODP pricing is not granted the [BP] must wait 90 days or until the opportunity becomes redefined."  Pl.'s Opp. Mot. Summ. J. Ex. 54.  In 2010, Osborn's testimony is still that "[o]nce you . . . fail or you withdraw [from the ODP process], you're locked out for 90 days or until the definition of the project changes, something like that."  Osborn Dep. 137:5-8.

More specifically, one could infer from contemporaneous e-mails that the IBM employees responsible for z-BP relations believed that Mainline was locked out from requesting ODP in September 2007.  On September 7, IBM client manager Steve Shiflett appeared confused by the certification review initiated for the SEI opportunity and e-mailed IBM System z Business Partner Manager John Dieker: "not sure what changed but if Mainline is the other partner–they say they didn't qualify for ODP on 8/14."  Pl.'s Opp. Mot. Summ. J. Ex. 41.  That evening, Dieker wrote to another coworker:

> Marcia, I had forgotten, but was reminded....by Steve Shiflett...that Mainline back on 8/14 said that they did not qualify for ODP at SEI.  Thus, I can't see why we'd kick off a CERT REVIEW.  See my note back on 8/14 below.

*Id.* (ellipses in original).  Dieker e-mailed again three days later: "We do need to cancel the CERT REVIEW for System z . . . due to the fact that they went to kick off a ODP review back in

AUG.  And Mainline declined."  *Id.* at Ex. 43.

Statements by IBM employees after Mainline was given ODP also suggest that IBM

employees familiar with promises made to z-BPs believed Mainline had been locked out.  After

the September review decision was announced, IBM representative Jim Homer e-mailed a

coworker requesting that the decision to award Mainline ODP be reviewed because "the 'self-

policing' policy System z brand channels has promoted has been directly subverted."  *Id.* at Ex.

51.  IBM launched an internal investigation into the matter.  Notes suggest that IBM

representatives that oversee z-BPs such as Jeff Rogers, John Dieker, and Steve Shifflett may

have stated to investigators that they believed "when Mainline declined, they were locked out for

90 days."  *Id.* at Ex. 27.

September 2007 e-mails from the z-BPs themselves also suggest the z-BPs believed IBM

had promised to apply a lock-out period to Mainline.  Before Mainline attempted to request ODP

from IBM, Mainline representative Santa Kraft emailed his coworkers: "Keep in mind that

IBM's stance will probably be that we responded we did not have ODP, and will say that

response applies to the opportunity until fulfilled."  *Id.* at Ex. 31.  After ODP was awarded to

Mainline, GlassHouse representative Zozzaro e-mailed IBM representative Jim Homer

emphatically stating: "We clearly were the only BP to qualify for ODP pricing as a result of

Mainline backing out, withdrawing, declining from an ODP review on 8/14."  *Id.* at Ex. 53.

The reasonableness of Zozzaro's testimony about the general protocols that IBM had

communicated to GlassHouse may also be further supported by the written protocols that IBM

published after the disputed events.  In 2008, IBM distributed a written description of the ODP

program to z-BPs.  Some material provisions are:

- [I]f there is a conflict between two IBM Business Partners within the same System z opportunity . . . either one or both Business Partner(s) needs to initiate a "Self Policing" inquiry. . . . If a response is not received within 48 hours (or two business days), the non-responding Business Partner will receive Base Partner Price for that Opportunity.

- An Opportunity Development (ODP) review may be requested by one or both Business Partner(s) after Self Policing has been completed. Most common factors that result in the initiation on [sic] an ODP review are: . . . 2) No response is received from the Business Partner(s) within 48 hours after the initial request.

- An ODP decision – whether obtained through Self Policing or through the Review Process – is valid for the duration of the opportunity.

- If the Business Partner would like to change their ODP position, they have to . . . request to initiate a review or a re-review. This request may only be initiated 90 days after the initial decision date.

*Id.* at Ex. 11. While not direct evidence of the protocols that existed in and prior to August 2007, the written policy could lend circumstantial support to Zozzaro's testimony. A reasonable jury could believe that if IBM admits it adopted these protocols in writing in 2008, it had done so verbally years earlier.

In sum, GlassHouse has produced sufficient evidence to show a genuine issue of fact exists regarding whether IBM clearly promised it would apply a lock-out period to a competing z-BP when a competing z-BP declined to participate in an ODP review. GlassHouse presents evidence from which a reasonable factfinder could conclude that both GlassHouse and System z IBM employees recognized that a lock-out period had been clearly promised in August 2007. Testimony and e-mails from both GlassHouse and IBM employees could support a factual finding that, pursuant to IBM's promises, Mainline should have been denied ODP on the SEI opportunity. The weight and credibility of the various submissions is not an appropriate matter

to consider on this motion.  Accordingly, I will not grant summary judgment on the promissory estoppel claim on this ground.

 **B. Equitable Estoppel Claim (Count IV)**

While promissory estoppel is based on a promise regarding the promisor's future conduct, equitable estoppel is based on a misrepresentation of an existing fact.  *80 Nassau Assocs. v. Crossland Fed. Sav. Bank*, 169 B.R. 832, 842 (S.D.N.Y. 1994); *Triology Variety Stores, Ltd. v. City Prods. Corp.*, 523 F. Supp. 691, 697 n.3 (S.D.N.Y. 1981).  In New York, equitable estoppel requires: "'(1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts.'"  *Health-Loom Corp. v. Soho Plaza Corp.*, 709 N.Y.S.2d 165, 167(N.Y. App. Div. 2000) (quoting *Holm v. C.M.P. Sheet Metal*, 455 N.Y.S.2d 429, 433 (N.Y. App. Div. 1980)).  IBM argues that GlassHouse has not identified facts to support the elements of an equitable estoppel claim; I agree.

GlassHouse fails to identify a theory of equitable estoppel that the Court can find as distinct from its promissory estoppel claim.  GlassHouse has not identified a misrepresentation of a present fact—as opposed to a promise about future action—that IBM conveyed to GlassHouse and upon which it detrimentally relied.  GlassHouse's alleges that "IBM failed to reveal . . . that it would not hold itself to . . . its own rules, policies, and protocols."  Compl. ¶ 61 (emphasis in original).  Despite the change in phrasing from its promissory estoppel claim, this allegation is also that IBM did not tell GlassHouse it would break its promises about future action.  These same alleged promises, and IBM's failure to adhere to these promises, are the basis for what the

Court considers as GlassHouse's promissory estoppel claim. Because I can find no facts that could support a distinct cause of action, I will grant summary judgment for IBM on the equitable estoppel claim.

### C. Whether the Agreement Precludes the Claims

IBM also asks that I reconsider whether the parties' contract ("the Agreement") legally precludes GlassHouse from bringing estoppel claims.[7] I consider what is the appropriate preclusion doctrine to apply to the only remaining claim: promissory estoppel. I find that the quasi-contract preclusion doctrine is more appropriate than the tort doctrine for the type of promissory estoppel claim in this case. I then apply the quasi-contract preclusion doctrine to the record before me and conclude that there is a genuine factual dispute regarding whether the claim is precluded by the parties' Agreement.

### 1. The Appropriate Preclusion Doctrine

In *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Company*, New York's highest court explained two doctrines its courts developed to determine if a plaintiff is precluded from asserting claims based on events that occur in a contractual relationship: one for tort claims and one for quasi-contract claims.[8] 516 N.E.2d 190 (N.Y. 1987). Together, these doctrines provide that a plaintiff cannot assert quasi-contract or tort claims for a dispute covered by a contract.

---

[7] In IBM's motion to dismiss it argued that the tort preclusion standard should be applied to dismiss GlassHouse's claims. Def.'s Mot. Dismiss 10-11; Def.'s Mot. Summ. J. 19. I applied the tort preclusion standard and found that the claims should not be dismissed. *GlassHouse*, 607 F. Supp. 2d at 715. IBM now argues that standard that was applied was incorrect and that the quasi contract preclusion doctrine should be used to dismiss the claims.

[8] Based on the choice-of-law provision in the Agreement, the parties agree that New York law governs its construction. Def.'s Br. Mot. Dismiss 1; Pl.'s Mem. Opp. Def.'s Mot. Dismiss 3 n.1.

To apply the appropriate doctrine described in *Clark-Fitzpatrick*, a court must first identify a claim as based in tort or quasi contract. Quasi contracts "give rise to obligations more akin to those stemming from contract than from tort" and the obligations are imposed by law "to assure a just and equitable result." *Bradkin v. Leverton*, 26 N.Y.2d 192, 196 (1970). Torts, in contrast, involve duties imposed "by law as a matter of social policy." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 550 (1992). "In disentangling tort and contract claims," courts also consider "the nature of the injury, the manner in which the injury occurred and the resulting harm." *Id.* at 552.

After the nature of the claim is ascertained, the appropriate doctrine described by the *Clark-Fitzpatrick* court can be applied. For tort claims, a person cannot sue "unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick*, 516 N.E.2d at 193. "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Id.* at 194. As for quasi-contract claims, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Id.* at 193. "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.*

Promissory estoppel claims do not fall easily into either category of tort or quasi contract. Litigants have brought claims in contract and tort, law and equity, all under the guise of

promissory estoppel.[9]  *See Merex A.G.*, 29 F.3d at 824-25.  One species of promissory estoppel is where a party asks a Court to enforce a promise despite an absence of consideration.  *See Porter v. Commissioner*, 60 F.2d 673, 675 (2d Cir. 1932) ("'[P]romissory estoppel' is now a recognized species of consideration.").  This principle is described in the Restatement of Contracts: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  Restatement (Second) of Contracts § 90 (1) (1981).  That is, the promise is enforced like a contract against the promisor because the court uses the promisee's reliance as a substitute for bargained-for consideration.

This kind of promissory estoppel is more akin to quasi contract than tort because it concerns the enforcement of a promise rather than an independent duty created by tort law.  A promissory estoppel claim is also more quasi contractual than tortious if the injury to be remedied is like that suffered from a breach of contract, as opposed to the type of harm that a tort duty seeks to prevent such as a personal injury or property damage.  Numerous New York courts have found the quasi-contract doctrine more appropriate than the tort doctrine for promissory estoppel.  *See, e.g.*, *Reckson Operating P'ship, L.P. v. N.Y. State Urban Dev. Corp.*, 751 N.Y.S.2d 279, 291 (N.Y. App. Div. 2002); *Air Atlanta Aero Eng'g Ltd. v. SP Aircrafts Owner I, LLC*, 637 F. Supp. 2d 185, 195-97 (S.D.N.Y. 2009); *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009); *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 154 (S.D.N.Y. 2007); *Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 253 (E.D.N.Y.

---

[9] Further complicating matters, New York state courts have at times used the phrase "equitable estoppel" to refer to the claim.  3-8 Corbin on Contracts § 8-12 n.367.

2006).

GlassHouse's promissory estoppel claim is based on the ODP program protocols: IBM's promises as to how it will conduct its relationship with its z-BPs. Compl. ¶ 20. GlassHouse argues it detrimentally relied on the promises, performing "its marketing and sales activities with confidence that the accounts it developed through its efforts would not fall into the hands of a different, 'free riding' BP that had not performed such activities." *Id.* ¶ 21. GlassHouse seeks to be compensated for losing the SEI sale and account. *See id.* ¶¶ 41, 46, 48.

GlassHouse asks the Court to enforce IBM's promises, using GlassHouse's detrimental reliance on those promises as a substitute for consideration. This is the type of promissory estoppel described in Restatement (Second) of Contracts § 90. *See* Compl. ¶¶ 43-48; Pl.'s Surreply Mem. Opp. Mot. Summ. J. 18. The *Clark-Fitzpatrick* quasi-contract standard is more appropriate than a tort standard for this claim because the alleged obligations are "more akin to those stemming from contract than from tort." *Clark-Fitzpatrick*, 516 N.E.2d at 193. IBM's obligation exists because of its promise to GlassHouse. The injury in this case is also the kind of harm that contract law traditionally seeks to remedy: the loss of a sales opportunity.

Therefore, I revisit the promissory estoppel claim under the quasi-contract doctrine of *Clark-Fitzpatrick*.[10] Neither party disputes the existence, validity or enforceability of the Agreement. I need only consider whether the scope of the Agreement "clearly covers the dispute between the parties." *Clark-Fitzpatrick*, 516 N.E.2d at 193; *see Schwartz v. Pierce*, 870

---

[10] A quasi contract has also been said to be "a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark-Fitzpatrick*, 516 N.E.2d at 193. The distinct cause of action for "unjust enrichment," however, is just one of many claims that lie in quasi contract.

N.Y.S.2d 161, 165 (N.Y. App. Div. 2008).[11]

> *2.* Whether the Claim is Precluded Under the Quasi-Contract Doctrine

Taking the facts most favorably to the Plaintiff and applying the appropriate doctrine, GlassHouse's promissory estoppel is still not precluded by the parties' Agreement because IBM's promises are beyond its scope.

According to GlassHouse, IBM made a set of clear and unambiguous promises independent from the terms stated in their Business Partner Agreement: the ODP program protocols for the thirteen z-BPs. The Agreement discusses the topic of how a BP will receive pricing and discounts from IBM, but it does not detail the ODP program for z-BPs. In contrast, the ODP program protocols includes promises regarding when a z-BP would be entitled to ODP from IBM, how z-BPs should interact with each other (i.e. self-policing), how IBM would regulate competition amongst its z-BPs, and when a competing z-BP would be "locked out" from claiming ODP for a sales opportunity.

GlassHouse alleges that in reliance on IBM's promises about ODP, it engaged in "its three-year process of significant sales and marketing activities with SEI." Compl. ¶¶ 45, 64.

---

[11] IBM phrases the relevant preclusion standard for quasi-contract claims in the broader language in *Clark-Fitzpatrick*: whether the contract pertains to the same subject matter. Def.'s Mot. Summ. J. 20. However, the cases IBM cites show that courts dismiss quasi-contract claims after determining whether the scope of the contract covered the obligation or issue in dispute. *Compare Air Atlanta Aero Eng'g Ltd.v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (claims precluded because claim "seeks compensation for the precise services covered by" the written agreement), *with Tierney v. Omnicom Group, Inc.*, No. 06-cv-14302, 2007 WL 4526615, at *4 (S.D.N.Y. Dec. 20, 2007) (rejecting motion to dismiss claims because the "scope" of the contracts could not be said "to clearly cover the services" in dispute); *see also Union Bank, N.A. v. CBS Corp.*, No. 08-cv-8362, 2009 U.S. Dist. LEXIS 48816, at *19-29 (S.D.N.Y. June 9, 2009) (reviewing how New York courts have not applied the broader subject matter standard when the scope of the agreement did not cover the disputed issue).

GlassHouse also states that it relied on IBM's promises about how IBM would regulate z-BP competition when GlassHouse contacted z-BP competitor Mainline to advise it of the SEI opportunity. GlassHouse argues that a z-BP would not e-mail a competitor to inform it of a prospective sales opportunity unless IBM had promised to hold that z-BP to their response in self-policing or withdrawal from an ODP review.

GlassHouse's promissory estoppel claim is based on IBM's promises regarding how IBM would treat competing z-BPs. GlassHouse argues that the Agreement does not cover how either party should or will interact with other z-BPs. IBM has not identified a provision of the Agreement that shows these matters are covered by the Agreement. From the record before me, a factfinder could agree with GlassHouse that the scope of the Agreement is limited to defining obligations between IBM, GlassHouse, and end-users. Glasshouse's promissory estoppel claim is like others that courts have found to not be precluded by the parties' contract. *See, e.g.*, *Satellite Tracking of People, LLC v. G4s PLC*, No. 08-cv-0126, 2009 U.S. Dist. LEXIS 83466, *18-21 (M.D. Tenn. Sept. 14, 2009) (business relied on another company's oral promise when it provided products beyond the geographical scope of the parties' written agreement); *Cardonet, Inc. v. IBM Corp.*, No. C-06-06637, 2007 U.S. Dist. LEXIS 83654, *8-10 (N.D. Cal. Nov. 5, 2007) (business relied on another company's promise to pay for software use that exceeded the parties' written agreement).

In sum, a genuine factual dispute exists between the parties as to whether the Agreement "clearly covers the dispute between the parties." *Clark-Fitzpatrick*, 516 N.E.2d at 193. I will deny Defendant's motion for summary judgment on the promissory estoppel claim on this ground as well. *See IIG Capital LLC v. Archipelago, L.L.C.*, 829 N.Y.S.2d 10, 14 (N.Y. App. Div.

2007) (reinstating a quasi-contract claim because the agreement did not clearly cover the dispute in issue).

### IV. CONCLUSION

Summary judgment will be granted on count IV because GlassHouse has not identified sufficient facts to support an equitable estoppel claim. The motion will be denied as to Count I because there is a genuine dispute regarding whether the promises were made and, if made, whether those promises were covered by the parties' existing Agreement.

s/Anita B. Brody
_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to: